IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LARNELL HENDRICK,                    *
     Plaintiff.

                        *

     v.                              CIVIL ACTION NO. DKC-14-2398

                        *

CO II JUSTIN GORDON
CO II BENJAMIN FRIEND,              *
CO II JEREMY CRITES,
SGT. HITE (Female Sgt.),            *
DAWN HAWK, R.N.,
     Defendants.                    *

                        ******

**MEMORANDUM OPINION**

Larnell Hendrick ("Hendrick") filed this 42 U.S.C. § 1983 prisoner civil rights action presenting claims arising from a use of force incident on June 29, 2013 at North Branch Correctional Institution ("NBCI") in Hagerstown, Maryland.  Defendants CO II Justin Gordon, CO II Benjamin Friend, CO II Jeremy Crites, and Sergeant Jessica Hite (collectively "State Defendants), by their counsel, filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 30) to which Hendrick filed a response in opposition and declaration. (ECF No. 34, 34-1).  Defendant Dawn Hawk, R.N., by her attorneys, filed a separate Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 27) to which Hendrick filed an opposition with his declaration (ECF No. 32, 32-2).  Hawk has filed a Reply. (ECF No. 36).

Upon review of the motions, exhibits, and applicable law, the court concludes that a hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below,  the State Defendants' dispositive motion (ECF No. 30), treated as a motion for summary judgment, will be denied.  Defendant Dawn Hawk's dispositive motion (ECF No. 27), treated as a motion for summary judgment, will be granted.

## BACKGROUND

On July 28, 2014, Hendrick filed this Complaint, alleging that on June 29, 2013, he was kicked and beaten by corrections officers Gordon, Friend, and Crites per the direction of Sergeant Hite.  As relief, he seeks compensatory and punitive damages of $20,000 and $15,000, respectively.  (ECF No. 1, p. 3).

Hendrick later amended the Complaint to add Dawn Hawk, R.N. as a defendant, faulting her for providing inadequate medical treatment after he was beaten. (ECF No. 14).  He requests monetary, compensatory, and punitive damages of an unstated sum against Hawk.  (ECF No. 14, p. 7).

### A.    Hendrick's Claims

Hendrick claims the assault began on June 29, 2013 at approximately 9:45-10:00 p.m. Hendrick maintains he and Hite had earlier engaged in "a verbal altercation" in Housing Unit 2D Wing.  Friend join the verbal altercation, telling Hendrick "bitch, shut up, write me up, who gives a fuck anyway."  Hendrick claims that he responded "Mind your business, I'm not talking to you.  I'm talking to the sergeant." (ECF No. 1-1, p. 1; ECF No. 32-22).  Friend and Crites then "snatched" him out of his chair[1]  and placed him in a holding cell.  Hite came up to the window of the holding cell, "balled up her fist' and said "[t]hey're going to fuck you up tonight."  *Id*. Hite then "threw a punch."  *Id*.

Approximately five to eight minutes later,  Friend, Gordon and Crites escorted Hendrick to Housing Unit 1, commenting on the way "[w]e're going to beat you to death, you fuck with the wrong CO's tonight."  Friend allegedly asked "[w]ho wants to do the choking?"  Suddenly, the officers "snatched" Hendrick's arms above his head while his hands were handcuffed from

---

[1]      Hendrick explains that he had been sitting in a chair and handcuffed in front of his cell on Housing Unit 2D Wing.  (ECF No. 1-1, p. 1).

behind and threw him to the ground on his face.  They started "racing [Hendrick] to the Housing

Unit 1 property area and slammed his head on the floor" and against the strip cage.  *Id*.  Hendrick

claims the officers kicked him in the head and back, and stomped on his legs until he lost

consciousness.  *Id*.  "Then CO II J. Gordon again choked me unconscious [sic]."  *Id.*  The

officers called him a "nigger, hor."  *Id*.  In his affidavit, Hendrick  attests he "was in total

compliance during this entire incident on June 29, 2013."  (ECF No. 32-2, p. 3).

Hendrick avers he sustained severe injuries to his head, back, knee, left eye, mouth, and

left collar bone.  (ECF No. 14, p. 3).  He was taken to the medical unit where Dawn Hawk, R.N.

allegedly "conspired" with the officers to "cover-up" and "conceal" the assault.  *Id*.  Hendrick

claims Hawk prevented him from removing his shirt or pants and ordered CO II Jamie Light to

"just take photos mainly of [Hendrick's] face so all of the injuries don't show."  *Id*. at 4.

Hendrick faults Hawk for providing him with two Tylenol pills for his pain and releasing him

back to his housing unit without additional treatment or calling for a doctor.  *Id*. at. 5.[2]

Hendrick claims that from July 1, 2013 through July 11, 2013, he submitted sick call

requests and asked NBCI officers for medical treatment of his injuries, to no avail.  He claims

Hawk failed to schedule follow-up appointments for him.  *Id*.

Hendrick complains that when he was seen by Hawk on July 13, 2013, for complaints of

severe head, right knee, back, legs, and shoulder pain, which he attributed to the July 29, 2013

incident, she denied his request to see a physician and stated, "[y]ou're allright and if you keep

filing those ARP grievances it might happen to you again."  *Id*. at 6.  Hawk "cracked jokes

---

[2]          In his affidavit, Hendrick asserts he "fell unconscious on the medical room bed."  (ECF No. 32-2, p. 4 ¶ 8).

saying that [Hendrick] should do 'stretching exercises'" to relieve the pain, and provided no additional treatment. *Id*.[3]

### B.     State Defendants' Response

The State Defendants assert that no excessive force was used against Hendrick.  In support, the State Defendants have filed a copy of the Internal Investigation Unit ("IIU") Report prepared after the incident (ECF No. 30-5) and summary declarations executed by Gordon, Crites, and Friend, attesting to the truth and accuracy of the contents of the Use of Force Incident Reports.  (ECF No. 30-2-4).

### 1.     Use of Force Reports

The Use of Force Reports prepared by Gordon, Benjamin, and Crites are consistent and summarized as follows.  At approximately 9:55 p.m. Gordon, Benjamin, and Crites were escorting Hendrick to the housing unit strip booth.  (ECF No. 30-2-4).[4]  Hendrick became resistant and refused to enter.  Hendrick refused to comply with several direct orders issued by Gordon to cease resisting and enter the strip booth.  In order to gain control and complete the strip search, Hendrick was taken to the floor by Gordon and Friend.  Hendrick resisted by "throwing his body around" and a "brief struggle ensued."  (ECF No. 30-2, p. 2).  Control was established and the handcuffs were removed from Hendrick to conduct a strip search.  Hendrick was lifted to his feet by Gordon and Friend.  At this point, Hendrick resisted the attempt to conduct a strip search.  Gordon and Friend controlled Hendrick's arms as he removed his own clothing and the strip search was completed.  *Id*.  Hendrick's handcuffs were replaced and he was secured in the strip cage to await medical attention for any possible injury.  Crites and Gordon escorted Hendrick to the medical unit in Housing Unit #1 where he was examined by Dawn

---

[3]       Hendrick recounts these events both in the Complaint and in the affidavit he filed in support of his opposition response (ECF No. 32-2).

[4]       None of the reports indicate why Hendrick was taken to the strip booth.  (ECF No. 30-5).

Hawk, and medically cleared to return to his cell.  Officer Jaime Light photographed Hendrick.

Hendrick refused to provide a written or verbal statement.  (ECF No. 30-2, p. 2).  Gordon and

Crites escorted Hendrick to temporary housing cell 1-C-2 without further incident.  (ECF No. 30-2-4).

On June 29, 2013, Lieutenant William E. Miller was assigned to investigate the use of

force incident.  (ECF No. 30-5, p 24).  Hendrick refused to provide a statement to him.  *Id.*

Miller noted there was no video footage of the incident,[5] and the closest camera to the area was

pointed away from the strip booth at the time of the incident.  *Id.* at 25.

Miller reviewed Hendrick's medical record and concluded his "injuries are consistent

with the reported struggle on the concrete floor as Inmate Hendrick attempted to resist control of

staff." *Id.* at 25.  Miller concluded "[a]fter reviewing all reports related to this incident and

interviews conducted with involved staff " the level of force used was appropriate. *Id.*[6]

### 2.   IIU Investigation Report

On July 9, 2013, Hendrick filed an Administrative Remedy Procedure ("ARP") request

regarding the incident, and an Internal Investigation Unit "IIU" investigation ensued.  Detective

Rodney Likin conducted the investigation.   Likin's report notes there was no video of the

incident. (ECF No. 30-4, pp. 16, 17).[7]

### a.   Interviews

On November 1, 2013, Likin interviewed Hendrick at NBCI.  Hendrick told him that on

June 29, 2013, there was a mass shakedown on his wing.  Unidentified correctional staff threw

---

[5]     No verified documentation is provided to the court regarding the lack of a video recording.

[6]     It is unclear what interviews Miller conducted as none are specifically referenced in his report. (ECF No. 30-5, pp.  24-25).

[7]     The IIU report states that per Sergeant Colin Detrick, there was no video because the DVR was out of service.  (ECF No. 30-5, pp. 16, 17).  The exhibit referenced in the report, exhibit 8 however, was not included among the documents provided with the investigative report to the court.  (ECF No. 30-5, p. 93).

Hendrick's mattress on the floor.  Hendrick became enraged and starting yelling at the officers to pick up the mattress.  When the investigator asked why he demanded staff  pick up the mattress, Hendrick stated, "Because other inmates throw shit on the floor."   (ECF No. 30-5, p 12). Hendrick complained to Sergeant Hite who alleged stated "Fuck you, file an ARP."  *Id*.  After Hendrick was removed to a holding cell, Hite walked by, shook her fist and said "[w]e are gonna fuck you up tonight."  *Id*.[8]

Hendrick denied resisting the officers during the escort to the holding cell.  *Id*.  He said the officers "just jacked me up and slammed my head into the sidewalk for no reason."  *Id*.  He states as soon as they arrived in Housing Unit 1, Gordon, Friend, and Crites pushed him down and kicked and punched his head, face, and chest.  *Id*.  Hendrick stated he was knocked out. While he was out, Gordon sat on his chest and choked him, stating "I'm going to kill you." Hendrick passed out again.  *Id*.

When the investigator asked Hendrick how he knew it was Gordon, if Hendrick was "knocked out," Hendrick responded that he knows Gordon's voice.  When asked if he was evaluated by a medical provider after the incident, Hendrick said, "Yes, but it was like four hours later."[9]

Detective Likin also interviewed Officers Gordon, Crites, and Friend.  Friend told Likin that as soon as they left Housing Unit 2, Hendrick became passively resistant by refusing to walk, so the officers modified the escort by raising Hendrick's hands over his head to make him bend over, in order to gain more control over him.  *Id*. at 13.  Friend said Hendrick would not enter the strip booth, so he was taken to the ground.  *Id*.  Hendrick started thrashing around and

---

[8]     Other than the comments Hite purportedly made to Hendrick, he provides no evidence to support his claim that he was assaulted per her instruction.

[9]     Hendrick indicated he wanted to pursue criminal charges against the officers.  After investigation, no charges were brought and the investigation was closed.  (ECF No. 30-5, p. 17).

kicking his legs.   Once Hendrick calmed, Friend removed the handcuffs and he and Gordon lifted Hendrick to his feet.   *Id*. at 14.   Hendrick became resistant, so in order to complete the strip search Friend and Gordon held his arms.   *Id*.   Friend denied using excessive force on Hendrick. *Id*.

Detective Likin also interviewed Crites, who stated that during the June 29, 2013, escort from Housing Unit 2 to Housing Unit 1, Hendrick started to drag his feet and did not want to walk so Gordon and Friend had to "jack him up" to get him to comply.   Crites explained "jack up" means to place the inmate's hands over his shoulder to make him bend over.   *Id*. at 14. When they arrived at Housing Unit 1, Hendrick refused to enter the strip booth.   He was taken to the floor, and started flailing.   Crites denied using excessive force during the escort.   *Id*. at 14-15.

Likin interviewed Gordon, who also stated Hendrick became resistant during the escort by refusing to walk.   *Id*. at 15.   Gordon said he and Friend raised Hendrick's hands above his head to gain more control over him.   When they arrived at Housing Unit 1, Hendrick refused to enter the strip booth, so he was taken to the ground.   *Id*. at 16.   Hendrick started to thrash and kick his legs.   When asked how Hendrick was strip searched, Gordon explained he and Friend lifted Hendrick to his feet.   They held his arms while he was strip searched.   Gordon denied using excessive force on Hendrick, and choking Hendrick, and denied that Hendrick became unconscious.   *Id*. at 16.

### b. Medical Records and Photographs

Hendrick was taken to the medical room at 10:22 pm.   *Id*. at 46.   The medical report states Hendrick reported knee and head pain.   Hendrick stated he felt faint and lay down on the bed.   He "repeatedly asked to be taken to the hospital, but refused to provide a reason why, just stated he didn't feel good."   *Id*.

Physical examination indicated Hendrick sat on the table unassisted, his speech was clear, and his respirations were even and nonlabored. *Id.* He had a tooth-sized abrasion on his bottom lip without active bleeding and superficial abrasions to his left eye brow, left collar bone, and right knee cap. Nurse Hawk cleaned the abrasions, gave him Tylenol, and medically cleared him to be returned to his cell. *Id.*

Photographs were taken of Hendrick's face and knee while he was in the medical unit. The photo of the knee shows a small abrasion *Id.* at 40, 44. The facial photos are unremarkable.

### C.      Hawk's Response

Hawk has filed her affidavit in support of her Motion for Summary Judgment. (ECF No. 27-5). She attests:

> On June 29, 2013, Plaintiff was seen by Affiant in the medical unit due to the use of force by correction officers on Plaintiff. Upon arrival to the medical unit, Plaintiff was asked if he had any injuries or complaints. In response, Plaintiff stated that his knee and head hurt. Plaintiff also stated that he felt faint and laid on the bed. Plaintiff repeatedly requested to be taken to the hospital but refused to state why: Plaintiff merely stated that he didn't feel well. During examination, Plaintiff sat unassisted on the bed. Plaintiff's speech was clear and his respirations were even and unlabored. A tooth sized-laceration was noted on Plaintiff's bottom lip with no active bleeding. Superficial abrasions were also noted around Plaintiff's left eyebrow, left collarbone, and right kneecap. Affiant cleaned all abrasions. Affiant instructed Plaintiff to place a sick call if his signs and symptoms did not improve or subside and Plaintiff voiced understanding. There was no evidence that Plaintiff's injuries were anything more than superficial nor did Plaintiff state that he was unconscious at any point and Plaintiff showed no signs of having been choked.
>
> On July 1, 2013, Plaintiff placed a sick call slip stating that he would like to be seen by medical because Plaintiff "banged [his] head" and because he believed his leg was fractured. Plaintiff made no mention of an altercation with correctional staff or any alleged cover up of the altercation.

*Id.* at 2-3 ¶¶ 6-7.

Hawk attests that at no time did she ever attempt to "cover-up or conceal any alleged assault against Plaintiff." *Id.* at 3 ¶ 16.  She states she acted in good faith to treat the injuries Hendrick sustained during the use of force incident.  *Id.*

Hendrick's medical record also indicates Nurse Kristi Cortez attempted to see Hendrick on July 2, 2013, in response to his July 1, 2013 sick call request.  The visit was rescheduled because Hendrick was on staff alert.  *Id.* at 3; *see also* ECF No. 27-4, p. 3.  On July 5, 2013, Hendrick refused a sick call visit from Hawk, and a release of responsibility form was completed by corrections staff and Hawk.  ECF No. 27-3, p. 3; *see also* ECF No. 27-4, p. 4.

On July 13, 2013, Hendrick was seen for complaints of head, back and right knee pain. He also stated his right knee was fractured with a bone out of place.  On examination, Hendrick's speech was clear and his respiration was unlabored and even.  He was observed to be in no distress and ambulated without difficulty or a limp with his back straight.  No redness was noted to his right knee which showed a normal range of motion.  No bumps, bruises, or open areas or marking were observed on his head.  Hendrick had a normal range of motion in his neck and back, without noted markings, swellings, or malformations.  When Ibuprofen and stretching exercises were suggested, Hendrick became angry and demanded to see a physician.  He was informed that he could not be seen at that time, but would be referred to a physician for evaluation.  (ECF No. 27-3. pp. 3-4).

On July 27, 2013, Colin Ottey, M.D., saw Hendrick for complaints of back and knee pain which he attributed to an altercation.  Examination found his spine was positive for posterior tenderness and a paravertebral muscle spasm was noted.  Hendrick's right knee was positive for tenderness and he had moderate pain with motion.  No motor weakness was observed.  Ottey diagnosed Hendrick with a backache and knee pain and provided Ibuprofen and Baclofen.

Hendrick's right knee and lumbar spine were x-rayed.  The x-ray results were normal.  (ECF. No. 27-3, pp. 4-5).

Ottey saw Hendrick for a follow-up visit on August 10, 2013.  Hendrick complained his pain increased with prolonged standing, walking and twisting, and was advised to continue his medication and exercise program and advised to avoid lifting heavy weights.  *Id*. at 5; *see also* ECF No. 27-4, p. 12.[10]

## DISCUSSION

I.    **Legal Standards**

A.    **Summary Judgment**

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion.  *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir.2007).  If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed.R.Civ.P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp*., 109 F.3d 993, 997 (4th Cir.1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

Hendrick was provided notice of defendants' dispositive motions and an opportunity to respond with verified exhibits and declarations consonant with the holding in *Roseboro v.*

---

[10]    Hendrick also reported vision changes.  The court notices he has been previously diagnosed with papilledema and pseudotumor cerebri, medical conditions which affect his vision and cause blackouts, dizziness, and severe migraines.  *See Hendrick v. Wexford Health Sources, Inc*., Civil Action No. TDC-14-2544 (D. Md. 2014).  (ECF No. 1).  Hendrick avers the injuries sustained in this incident have exacerbated this pre-existing condition.  (ECF No. 32-2, p, 11).

*Garrison*, 528 F.2d. 309 (4th Cir. 1975) (holding self-represented plaintiffs should be advised of their right to file responsive material to a motion for summary judgment), and has filed oppositions to the dispositive papers.  (ECF Nos. 23, 26, 31, 33).  The court will therefore treat Defendants' dispositive papers as motions for summary judgment.

Rule 56 of the Federal Rules of Civil Procedure states a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249.

In undertaking this inquiry, this court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Ricci v. DeStefano*, 557 U.S. 557 (2009), but must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249–50.  On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.,* 190 F.3d 624, 633 (4th Cir. 1999).

The court is mindful that Hendrick, a self-represented litigant, is "held to a 'less stringent standard than is a lawyer, and must liberally construe his claims, no matter how "inartfully"

pled." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims by self-represented litigants should be held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 Fed. Appx. 332, 334 (4th Cir. 2013) (same).

### B.       Claims against the State Defendants

The Eighth Amendment's prohibition against "cruel and unusual punishment" prohibits prison officials from inflicting pain unnecessarily and wantonly against prisoners. *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Hill v. Crum*, 727 F.3d 312, 317 (4th Cir. 2013) (It is the nature of force used by the correctional officer, rather than the extent of the prison inmate's injury, that is the relevant inquiry in an Eighth Amendment claim.   An inmate's Eighth Amendment claim involves a "subjective component" and an "objective component." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008).   Specifically, the court must decide "whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).   Where, as here, a prisoner makes an excessive force claim, the court's subjective component analysis "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citations omitted); *see also Williams*, 77 F.3d at 761.

This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321.   The absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34,

36–39 (2010).  It is the nature of force used by the correctional officer, rather than the extent of the prison inmate's injury, that is the relevant inquiry in an Eighth Amendment claim.  *See Hill*, 727 F.3d at 320–321.  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Id*.  Not every malevolent touch by a prison guard, however, gives rise to a federal cause of action for excessive force in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.  *Id*. at 37.

Viewing the facts in the light most favorable to Hendrick, his account of the incident as stated in the Complaint and his declaration is that Gordon, Friend, and Crites kicked, punched, and stomped on his face, back, neck, and legs on January 29, 2013.  (ECF No. 1, ECF No. 32-2).[11]  His head was rammed into the strip cage, rendering him unconscious, then choked by Gordon until he fully lost consciousness.  Hendrick avers he was "in total compliance," presumably with the directions issued to him by the officers, during the incident.  (ECF No. 32-2, p. 3 ¶ 6).  Hendrick's claims of head and knee pain are supported by the medical report made immediately after the incident which records he complained of head and knee pain.  (ECF No. 30-5, p. 46).

Hendrick has confronted the Correctional Defendants' summary judgment motion with an affidavit and evidence showing that there is a genuine issue for trial.  In light of Hendrick's declaration and consistent allegation facts, it is puzzling why the summary affidavits filed by Gordon, Friend and Crites, which merely referenced their reports to the investigator, fail to address directly claims that they kicked, punched, and stomped on him.  (ECF No. 30-2-4). None of their affidavits directly address Hendrick's claims that he was twice rendered

---

[11]       It is unclear whether Hendrick was still constrained in handcuffs at this time.

unconscious by choking.  *Id.*  No declaration whatsoever has been provided to refute Hendrick's claims against Sgt. Hite.  In fact, the State Defendants do not address the claims against Hite at all.

In light of the record before this court, there is a genuine dispute of material fact about whether the State Defendants used excessive force against Hendrick in violation of the Eighth Amendment on June 29, 2013.  There exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," as such summary judgment is inappropriate.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) ("Credibility determinations ... are jury functions, not those of a judge...").  Further, if the actions of Defendants occurred in the manner alleged by Plaintiff, qualified immunity would not apply.  Accordingly, the State Defendants' Motion for Summary judgment is denied.

### C.  Claims Against Dawn Hawk

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837(1994).

As noted, objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer,* 511 U.S. at 839–40.  "True subjective

recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995), quoting *Farmer*, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.

"[A]ny negligence or malpractice on the part of ... doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones,* 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

The record demonstrates Hawk treated Hendrick immediately after the incident for injuries which she observed and diagnosed as superficial. Hawk examined Hendrick, cleaned his abrasions, and provided him with Tylenol. Although Hendrick asked to be taken to the hospital, he gave no reason for his request other than that he did not feel well. In her affidavit, Hawk denies allegations that she attempted to cover-up or conceal Hendrick's injuries.

Under these circumstances, Hendrick fails to show that Hawk acted with requisite deliberate indifference to his medical needs. Instead, his claims suggest his disagreement with the medical provider over the severity of his injuries and the nature of the treatment she

provided.  Additionally, the record shows Hendrick's subsequent complaints of head, knee, and back pain were evaluated and treated by prison medical providers.  Hendrick's disagreement with the medical care provided to him does not show deliberate indifference, nor does it support a claim of constitutional dimension.  Thus, even when the facts are viewed in the light most favorable to Hendrick, there are no genuine issues of material fact and Hawk is entitled to summary judgment in her favor as a matter of law.

## CONCLUSION

For these reasons, the Motion for Summary Judgment filed by CO II Justin Gordon, CO II Benjamin Friend, CO II Jeremy Crites, and Sergeant Jessica Hite (ECF No. 30) will be denied. The Motion for Summary Judgment filed by Dawn Hawk, R.N (ECF No. 27) will be granted. Hendrick will be granted twenty-eight days to request appointment of counsel.  A separate Order follows.

August 27, 2015                                    _____/s/_____
                                                   DEBORAH K. CHASANOW
                                                   United States District Judge